## UNITED STATES v. OPPENHEIM et al.

(District Court, N. D. New York. November 30, 1915.)

1. CRIMINAL LAW ⬦863—INSTRUCTIONS—FURTHER INSTRUCTIONS AFTER RETIREMENT OF JURY.

A federal court may properly give additional instructions to a jury which has returned into court and reported its inability to determine certain questions of fact, and in doing so may call attention to all or any part of the evidence bearing on such questions and state the contentions of the parties with respect to its bearing and weight.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2065–2067; Dec. Dig. ⬦863.]

2. COURTS ⬦374—FEDERAL COURTS—STATE LAWS OR RULES GOVERNING PROCEDURE.

With respect to the charging of juries a federal court is not affected by state statutes or rules of procedure.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 981, 982; Dec. Dig. ⬦374.]

**3.** CRIMINAL LAW ⬡⟿760—INSTRUCTIONS—WEIGHT AND EFFECT OF EVIDENCE.

A court in its charge may illustrate the manner in which a fact may be proved other than by direct evidence by stating a hypothetical case.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1749; Dec. Dig. ⬡⟿760.]

**4.** WITNESSES ⬡⟿277—EVIDENCE—ADMISSIONS—PRIVILEGE.

A defendant in a criminal case, who testifies in behalf of himself and other defendants, may, when it is proper cross-examination, be asked as to a written statement voluntarily made by him to the district attorney prior to any charge against him relating to the general subject-matter, or if he did not testify to certain facts before a grand jury, other than the one which afterward indicted him, after expressly waiving immunity in writing.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 925, 979–983; Dec. Dig. ⬡⟿277.]

**5.** CRIMINAL LAW ⬡⟿736—EVIDENCE—ADMISSION BY ACCUSED.

When it becomes a question of fact whether or not a confession or admission was voluntary, the same is admissible in evidence, and the jury is to determine the fact, and what credit they will give the statement made.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1219, 1220, 1221, 1701, 1702, 1705, 1716; Dec. Dig. ⬡⟿736.]

**6.** WITNESSES ⬡⟿305—PRIVILEGE OF ACCUSED IN CRIMINAL CASES—CROSS-EXAMINATION.

Where the defendant in a criminal case takes the stand and testifies, he waives his constitutional privilege of silence, and may be cross-examined with the same latitude as other witnesses.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1053–1057; Dec. Dig. ⬡⟿305.]

Criminal prosecution by the United States against Baron Eugene Francois Oppenheim, Howard G. Rogers, and Richard Murphy. On motion for new trial and in arrest of judgment after conviction, on exceptions to remarks to the jury by the court on the jury coming in for further instructions after having been out for at least 24 hours. Motion denied.

Costello, Burden, Cooney & Walters, of Syracuse, N. Y., for defendants Oppenheim and Rogers.

Charles N. Bulger, of Oswego, N. Y., for defendant Murphy.

Frank J. Cregg, Asst. U. S. Atty., of Syracuse, N. Y., and Wrisley Brown, Sp. Asst. Atty. Gen., of Washington, D. C.

RAY, District Judge. In this case, after a prolonged trial of seven weeks, with long sessions, including one or two Saturdays, and two whole days devoted to summing up by counsel, and after a lengthy charge occupying about five hours, including the consideration of numerous requests, the jury informed the court the second time that it desired further instructions. Thereupon the marshal was directed to bring the jury into court, whereupon the following occurred:

"Well, gentlemen, is there anything the court can do? Any further charge or instructions?

"The Foreman: We have looked the evidence over, and worked hard over it, and seem to be divided, and it does not look as if we could agree.

"The Court: Well, on the questions of law, divided on the questions of law, legal questions?

"The Foreman: On questions of evidence.

"The Court: Anything I could call your attention to, gentlemen, in regard to the evidence? Is it in regard to the weight of the evidence, or what the evidence is?

"The Foreman: We would like to know the time when—the evidence as to when Howard J. Rogers [one of the defendants] first knew that there had been money appropriated from the bank; and also Baron Oppenheim [another defendant]."

The indictment in count 1 charged a conspiracy between Wm. T. Brice, a clerk, and sometimes acting teller, in the First National Bank of Amsterdam, and the defendants on trial, Oppenheim, Rogers, and Murphy, to abstract and also to misapply the funds and credits of said bank for the benefit of all; Brice to do the actual abstracting and misapplication, and the others to aid and abet him in so doing, all sharing in the funds and credits so illegally obtained. It is not disputed that the bank was short some $180,000, or that something like $69,000 of this shortage was obtained from the bank mainly by means of checks drawn on the bank by Murphy, and by Murphy as attorney, and by "Brice-Riley Realty Company, Murphy, Vice President," and by Oppenheim and by Rogers on many occasions, and paid from the funds and credits of said bank without its knowledge, or that of its board of directors, through the artifices and manipulations and concealments and false entries of Brice in the bank. Neither of these persons had any account in the bank, except that Brice had opened a false account for Rogers in "the loose leaf" ledger to aid in the abstraction, etc.

The other counts in the indictment, some 500 or 600 of them, charged that Brice either abstracted or misapplied the funds of the bank, and that Oppenheim, Rogers, and Murphy aided and abetted him in so doing. On some occasions money was taken out by Brice directly and passed over to some one of the other defendants. Brice testified as a witness for the government, and testified that at a time early in 1911 he in substance informed the other defendants that the money must come from the bank and was coming from the bank. It was, of course, necessary to corroborate Brice, and admissions and statements of Murphy and Rogers were used, as were 'the letters of Rogers, Oppenheim, and Murphy, in addition to the checks themselves. A visit of Oppenheim to Amsterdam to obtain money from Brice, and during which visit he obtained money from Brice, was proved, as was a visit made by Rogers to that place, and what occurred; also many visits by Murphy. Scores of letters written by Rogers and Murphy were in evidence, and one at least written by Oppenheim. The story of the visit by Oppenheim to Brice at Amsterdam as described by Brice differed in some respects from that told by Oppenheim, but both agreed that the visit was to obtain money through Brice; that Oppenheim went to the bank, but that no business was transacted there or discussed there; that they went to the engine house of the fire department of the city and there conversed; that an appointment was made to meet at a hotel, and that later they did

meet there, and that then Brice got the money, he says, from the bank without its knowledge, and took it to the hotel and delivered it to Oppenheim, who gave a receipt. Brice claimed this money came from the bank improperly, and that Oppenheim then knew it. Oppenheim claimed it was a mere loan from Brice, a man of wealth, he supposed.

It is unnecessary to go into or give the details of the transaction. The defendants all claimed that the money, aggregating some $69,000, came as loans from Brice and from his personal funds, and that they had no knowledge of the fact that Brice was improperly and illegally taking the money from the bank. The government contended that the defendants knew it was coming from the bank illegally, and that the defendants aided and abetted, incited, and at times coerced Brice to take the money through fear of disclosure by them and promises of speedy profits and returns from promotion enterprises in which the defendants were concerned and engaged and a share of which was promised Brice. To answer the question propounded by the jury as to what the evidence was as to when Rogers and Oppenheim first knew that money had been or was being taken from the First National Bank of Amsterdam, it was essential to call attention to what proof is necessary to make out knowledge, and also to the evidence bearing on that question of knowledge. The checks were drawn and the money taken, almost entirely, in comparatively small amounts during a period of nearly three years. The court, in view of the letters and documents, could not say to the jury that Rogers first knew at one time or at another time, and the same was true as to Oppenheim. It was for the jury to determine, on all the pertinent evidence, first did they or either of them *know* Brice was improperly taking this money from the bank; second, did they aid and abet him, incite and encourage and procure him to do so, and if they or any one of them did know, when did the defendant having knowledge at any time first become possessed of that knowledge.

The court proceeded, therefore, to indicate the modes of proof by which knowledge may be shown, and then went very briefly over the claims of the government as to what had been shown, and by what evidence as to the time when Rogers and Oppenheim obtained their knowledge, if any, that the money was coming from the bank. The jury was repeatedly told that the matters stated were the contentions of the government, and that it was for the jury to say when the respective defendants first knew the money was being abstracted or misapplied. The jury came in for instructions on two occasions, and had been distinctly told that, inasmuch as Brice was alleged to be a conspirator, one or more of the defendants on trial might be found guilty on the conspiracy count and the others acquitted, and that on the other counts one or all the defendants on trial might be found guilty, or that some one or all might be found guilty on some of the counts and acquitted on the others, depending on when such defendants repectively had knowledge that Brice was taking the money from the bank or misapplying its credits illegally.

In connection with directing the attention of the jury to the claims of the government and the letters referred to the following took place.

"Mr. Costello: I also except to what you said in reference to the letters written by Mr. Rogers and each of them. `

"The Court: Yes.

"Mr. Costello: I also ask you to state at this time—

"The Court: No; this is no time for requests.

"Mr. Costello, continuing: In connection with what you have already stated, that the defendants' evidence should be taken into consideration.

"The Court: I have told the jury many times, of course, to take into consideration all the evidence in the case, the evidence given by the defendants, and I tell them right here, in connection with what I have said, that they have heard the explanation given by Rogers, and the explanations, of course, given by Murphy, and the explanations given by Oppenheim. The question is, of course, whether they explain." .

Then, after referring to the contentions, the court said:

"It is for you to say, gentlemen. Take the letters as a whole, as I told you before, and the surrounding circumstances and conditions."

Then, after referring to another contention, the court said:

"I have tried to call your attention to that, gentlemen, very pointedly, to what the government contends. It is a question of fact for you as intelligent men."

Then later again:

"Mr. Costello: I would like to ask your honor to charge the jury that the answer to their question of when Rogers or Oppenheim knew is a question of fact for them, to be determined from all the evidence.

"The Court: I have stated that very many times."

Then later the court again said:

"Of course, gentlemen, you understand that the questions of fact are for your decision, and the questions of law for the court. The weight of evidence is for you, subject to the rules of law which I have given you."

Then later:

"These defendants are on trial for something that may involve their liberty, and of course that you are to have in mind in weighing their evidence. Brice is jointly indicted with them. The situation is as I have stated. Has that induced him to give false or colored testimony? Have all that in mind, the probabilities and the improbabilities, the reasonableness and the unreasonableness of the stories told, in view of the light of all the other facts and circumstances in the case—the naturalness or the unnaturalness, in view of the circumstances, the things done, etc. All of that is for the jury to consider in arriving at a decision and determining what the truth is, unbiased, as I have told you, and unprejudiced, without passion, without fear, unaffected by sympathy; that is, in deciding what the facts are. A man without human sympathy is not, I might say—my opinion, I will put it—not a fit member of society, because he would be cruel and heartless, and might be restrained only by his fear, perhaps, or judgment. But we are not—the judge on the bench is not to be swayed by it in stating the law; the jury, in deciding the facts, is not to be swayed by it or consider it. What are the facts? What is the truth? And with the consequences, as I have said before, I think, to these defendants, with that you have nothing to do. That is with the court and the pardoning power. It is for you to say what the truth is as honest, intelligent citizens, called upon to exercise your good judgment in weighing and considering evidence and giving weight to it, that which commends itself to your belief. I think that is all that I need to say to you now, gentlemen. You may retire.

"Mr. Costello: I desire to except to your honor's remarks as made since my former exception.

"The Court: Oh, yes."

The jury in the main charge had been plainly told that the burden of proof was on the government, that guilt must be established on all the evidence beyond a reasonable doubt, and that the defendants were entitled to the benefit of every reasonable doubt, and that the evidence must be inconsistent with the innocence of the defendants, and if just as consistent with innocence as guilt then the defendants should be acquitted; also that defendants and each of them was presumed innocent until proven guilty, and that such presumption accompanied the defendants all through the trial, and at every stage of it, and on all questions necessary for the government to establish, and until overcome by evidence which satisfied the jury of the guilt of the defendants beyond a reasonable doubt; also that all questions of fact were for the jury to decide, and questions for them. This had all been stated a second time in the main charge in response to requests submitted by the defendants.

As to defendant Oppenheim's knowledge that the money was taken from the funds and credits of the bank, the government had shown by the defendant Murphy when on the stand that on one occasion, after he (Murphy) knew that Brice was short in his accounts at the bank, Murphy went into Oppenheim's office and informed him that Brice was short in his accounts at the bank, and that Oppenheim said nothing, showed no surprise, and soon thereafter drew a check or checks on the bank, having no account there, and induced Brice to cause them to be paid, which was done from the funds of the bank without its knowledge. The claim and contention of Oppenheim was that he was borrowing of Brice; that Brice had agreed to loan him money as a favor when he wanted it, and that he honestly believed Brice was a man of wealth and teller or cashier in the bank. The defendant Oppenheim, as a witness on his own behalf, flatly contradicted Murphy as to this interview and conversation. The government contended that from this conversation Oppenheim, in the light of other facts and circumstances, was informed that Brice was taking money from the bank improperly to meet the demands of the defendants, and that at this time, if not before, Oppenheim was informed and must have known that the money he was obtaining from Brice was coming from the funds of the bank, and that, as Oppenheim showed no surprise, it was some evidence that he already knew Brice was taking money from the bank, as Brice had testified. On this subject, when the jury was in for instructions the second time, the court said:

"Now, gentlemen, the defendant Murphy, the government says that he shows every purpose possible to shield and cover the other defendants. That is the way they put it. He shows every disposition not to say anything that would harm them or be against them; but he says that in January, as I have called your attention, that Oppenheim was told directly. So that he then knew and that he did not say a word, evinced no surprise, when told that Brice, who had been helping them all, voluntarily advancing money, Brice, a man of wealth, thought by all of them to be wealthy, that Brice, who had been helping them all, helping Rogers, a member of the firm of Oppenheim & Co., been helping Murphy, not a member, was short at the bank. Murphy knew that, and the claim is they all knew it when Brice was advancing the money to Oppenheim & Co. to the amount of a great many thousand dollars,

as evidenced here by the papers and notes. Now, gentlemen, Murphy says that Oppenheim was silent when he went in there and told Oppenheim that Brice was short—in substance, I won't repeat the language—short in his accounts at the bank; that he was in trouble. Of course, it is assumed that Oppenheim, a financial man, who had been engaged in financial matters all his lifetime, connected with banking houses all his lifetime, the government says that the jury should understand what that meant; that it would indicate to a man of that character trouble between the bank and Brice because he was short in his accounts, and that that would mean trouble because under the statute it is not a mere indebtedness—it is using the money of another unlawfully and improperly. The government claims that when Murphy told Oppenheim that, told Oppenheim, the man that Brice had helped to the amount of thousands of dollars to him personally and to others and to the firm of which he was a member, and then to others, when he told him that, that if Oppenheim had been ignorant of the fact, had not already known it, that he would have evinced some surprise, said something. Now, has Murphy, connected with this case as he is—has Murphy come here and committed perjury against Oppenheim? Has he come here and told a willful lie, and shielded him in all other respects? the government says. That is their contention. It is for you to say. The government says that it was substantially in a way an admission, his mere silence, his showing no surprise, that he did know the facts. Of course, there is evidence here that on at least one or two occasions he was told the same thing. That other evidence came from Brice, and defendants say you should pay no attention to it. I have been speaking of the evidence from other sources in the main."

This was excepted to by Judge Bulger in behalf of the defendant Murphy. The general proposition presented on the argument is that when the jury came in for instructions the second time, after having been out over 24 hours, and presented the questions as to which they desired information, the court had no lawful right to go over any part of the evidence, and state the claims of the respective parties, and quote from the letters of Rogers.

[1] The jury was not sent for by the court, but was brought in for further instructions pursuant to its request. The jury indicated the question on which it desired information. The court could not fix a definite time when either defendant had knowledge, but only call attention to the evidence and claims of the government, so as to enable the jury to fix the time in case they found the defendants had knowledge at any time. The court had the right to recall the jury, and give further instructions, and comment on the evidence; and it was not the duty of the court, nor necessary for it, to recapitulate all the evidence on a given point or points, or the whole case, and the court had the right to go to the extent even of expressing an opinion on the facts (which it did not do), so long as the ultimate decision of the facts was left to the jury. Allis v. United States, 155 U. S. 117, 123, 124, 15 Sup. Ct. 36, 39 L. Ed. 91; Vicksburg & M. R. Co. v. Putnam, 118 U. S. 545, 553, 7 Sup. Ct. 1, 30 L. Ed. 257; Nudd et al. v. Burrows, 91 U. S. 426, 439, 23 L. Ed. 286; Simmons v. United States, 142 U. S. 148, 155, 12 Sup. Ct. 171, 35 L. Ed. 968; Young v. Corrigan (C. C. A. 6th Circuit) 210 Fed. 442, 443, 127 C. C. A. 174; Suslak v. United States (C. C. A. 9th Circuit), 213 Fed. 913, 919, 130 C. C. A. 391; Young v. Corrigan (D. C.) 208 Fed. 431, 436; Allen v. United States, 164 U. S. 492, 494, 17 Sup. Ct. 154, 41 L. Ed. 528; Wiborg v. United States, 163 U. S. 632, 656, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; Williams v. Conger, 125 U.

S. 397, 8 Sup. Ct. 933, 31 L. Ed. 778; Lovejoy v. United States, 128 U. S. 171, 173, 9 Sup. Ct. 57, 32 L. Ed. 389; Rucker v. Wheeler, 127 U. S. 93, 8 Sup. Ct. 1142, 32 L. Ed. 102.

In Allis v. United States, supra, it was expressly and distinctly held:

"It is common practice and no error to recall a jury, after they have been in deliberation for a length of time, for the purpose of ascertaining what difficulties they have in the consideration of the case, and of making proper efforts to assist them in their solution, and the time at which such recall shall be made must be left to the discretion of the trial court.    *    *    *    The rule repeated that in a federal court the presiding judge may express to the jury his opinion as to the weight of evidence. In making such a statement he is under no obligation to recapitulate all the items of the evidence, nor even all bearing on a single question."

In the opinion of the late lamented and able Mr. Justice Brewer (no dissent), the court (155 U. S. at pages 123, 124, 15 Sup. Ct. at page 38, 39 L. Ed. 91) said:

"It is a familiar practice to recall a jury after they have been in deliberation for any length of time for the purpose of ascertaining what difficulties they have in the consideration of the case, and of making proper efforts to assist them in the solution of those difficulties. It would be startling to have such action held to be error, and error sufficient to reverse a judgment. The time at which such a recall shall be made, if at all, must be left to the sound discretion of the trial court, and there is nothing in the record to show that the court, in the case at the bar, abused this discretion or failed to wait a reasonable time for the consideration of the case by the jury under the charge as already given. So far as 'arguing the testimony' is concerned, the only part of the charge that can be considered as even tending in that direction was that part referring to the question of intent. We see nothing in this of which any just complaint can be made. The illustration given by the court was apt and fair, and if it bore hardly upon the defendant it was only because the transaction, with which he was charged, was one of like character and indicative of the same intent. The illustration was put in the form of a question, and no affirmation was made as to the intent that must be presumed therefrom. Even if it contained an expression of opinion. such expression is permissible in the federal courts. Simmons v. United States, 142 U. S. 148 [12 Sup. Ct. 171, 35 L. Ed. 968]; Doyle v. Railway Co., 147 U. S. 413 [13 Sup. Ct. 333, 37 L. Ed. 223]. So far as respects the complaint that the court stated part of the testimony on a certain point without stating all, we know of no rule that compels a court to recapitulate all the items of the evidence, nor even all bearing upon a single question. There was no intimation that all the testimony bearing upon any particular point was stated. On the contrary, the plain declaration was that there was other testimony than that mentioned, and the jury was admonished to give that not mentioned as full and careful consideration as that mentioned."

In Vicksburg & M. R. Co. v. Putnam, 118 U. S. 545, 7 Sup. Ct. 1, 30 L. Ed. 257, the court held:

"At a trial by jury in a court of the United States, the judge may express his opinion upon the facts. The expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed by writ of error; and the powers of the courts of the United States in this respect are not controlled by state statutes forbidding judges to express any opinion upon the facts."

In the opinion by the late lamented and able Mr. Justice Gray the court (118 U. S. at pages 553, 554, 7 Sup. Ct. at page 2, 30 L. Ed. 257) said:

"In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts; and, the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed on writ of error. Carver v. Jackson, 4 Pet. 1, 80 [7 L. Ed. 761]; Magniac v. Thompson, 7 Pet. 348, 390 [8 L. Ed. 709]; Mitchell v. Harmony, 13 How. 115, 131; Transportation Line v. Hope, 95 U. S. 297, 302 [24 L. Ed. 477]; Taylor on Evidence (8th Ed.) § 25. The powers of the courts of the United States in this respect are not controlled by the statutes of the state forbidding judges to express any opinion upon the facts. Nudd v. Burrows, 91 U. S. 426 [23 L. Ed. 286]; Code of Georgia, § 3248. The exceptions to so much of the judge's charge as bore upon the liability of the defendant cannot therefore be sustained."

In Lovejoy v. United States, supra, the court said:

"It is established by repeated decisions that a court of the United States, in submitting a case to the jury, may at its discretion express its opinion upon the facts, and that such an opinion is not reviewable on error, so long as no rule of law is incorrectly stated and all matters of fact are ultimately submitted to the determination of the jury."

[2] And in these matters the statutes, rules, and practice of the state and state courts of the state in which the case is tried have no application. Nudd v. Burrows, 91 U. S. 426, 23 L. Ed. 286; Indianapolis, etc., R. Co. v. Horst, 93 U. S. 291, 23 L. Ed. 898; Vicksburg, etc., v. Putnam, 118 U. S. 545, 553, 7 Sup. Ct. 1, 30 L. Ed. 257; Lincoln v. Power, 151 U. S. 436, 14 Sup. Ct. 387, 38 L. Ed. 224; Chateaugay, etc., Iron Co., Petitioner, 128 U. S. 54, 9 Sup. Ct. 150, 32 L. Ed. 508.

[3] The court illustrated the mode in which a fact may be proved to exist, short of actually seeing the thing or acts which causes or caused an existing condition, by referring to the fact that to an intelligent man it may be proved that the sun is shining by having him look, through the window and see that it is broad daylight and that there are no artificial lights in the vicinity, where such observer knows the difference between sunlight and artificial light, even if he cannot see the sun. The court said:

"There are different ways of knowing a thing or a fact. It is not necessary, for instance, for a man to see the sun in order to know that the sun is shining, or if the curtain is down, and he cannot see the sun himself, but he can see that it is broad daylight, and that there are no artificial lights around, if he knows the difference between an artificial light and its effect and sunshine, and so on, he might arrive at a correct conclusion that the sun was shining, even if he didn't look out and have the sun there in his face. So, gentlemen, as to knowing a thing, or that a fact exists, as, for instance, this money was coming out of the bank, the government contends that aside from any expressed words, that as to Oppenheim and as to Rogers, if I remember rightly, the evidence shows that they knew and must have known that this money was coming out of the bank in the case of both of them, and especially in that of Rogers, that it was indicated in his letters, shown in his letters. I call your attention, gentlemen, on that question to the contention of the government."

In Allis v. United States, 155 U. S. 117, on page 120, 15 Sup. Ct., on page 37 (39 L. Ed. 91), the court, in charging the jury used this illustration:

"And if he caused these entries to be made, with what intent did he do so? If a customer or friend of yours, who owed you $40,000 on account, should come to you and tell you that he had deposited $50,000 to your credit in the German National Bank of Little Rock, and that he wanted a receipt for the $40,000 that he owed you and wanted a credit for the other $10,000, and you should give him the receipt and the credit, and should subsequently learn that he had never deposited one dollar in that bank for you, with what intent would you conclude he had made these statements? Would you think it was with an honest purpose, or with some intent to injure or defraud you?"

This was held proper, and the court said:

"Even if it contained an expression of opinion, such expression is permissible in the federal courts. Simmons v. United States, 142 U. S. 148 [12 Sup. Ct. 171, 35 L. Ed. 968]; Doyle v. Railway Co., 147 U. S. 413 [13 Sup. Ct. 333, 37 L. Ed. 223]."

In Instructions to Juries, by Blashfield, § 35, page 78, it is said, citing scores of cases:

"It is not a violation of the rule against the assumption of facts in instructions for the court to assume facts merely in order to illustrate the application of a proposition of law pertinent to the case. This is a common practice, and no intelligent juror can be misled by such illustrations."

In this case, after seven weeks of trial, extensive statements by the defendants as witnesses in their own behalf, and the introduction in evidence and reading to the jury of scores of letters, it was impracticable and unnecessary for the court to read or call attention in detail to all the evidence in the case even in the main charge. In Allis v. United States, 155 U. S. 117, 15 Sup. Ct. 36, 39 L. Ed. 91, the court held that:

"There is no error where an instruction gives *part* of the testimony on a certain point *without giving all of it*, since there is no rule compelling a court to recapitulate *all* the items of the evidence, *nor even all* bearing upon a *single question*."

Here by consent the jury had been furnished all the letters and all exhibits, and presumably had read them. They had been read to the jury in the presence of the court also during the trial. All the court could do by way of answering the inquiry of the jury was to call attention to the salient points in the evidence which pointed to knowledge on the part of the defendants that the money was coming from the bank, and not from the private funds of Brice, and the time when the defendants gained such knowledge.

As bearing on this it was proper to call attention, not only to the visits of Oppenheim and Rogers to Amsterdam, but to the letters written by Rogers to Brice, containing such expressions as:

"I want to talk to you to-morrow about the checks, so as to see just what can be done and have you send the money for the salaries. Can you be at the Warner at 5 p. m.? We can talk more freely then." And: "So keep mum yourself about it." And: "I know where the Amsterdam money came from, and I want to get it back to you. I don't need to feed it through him." And: "Do for God's sake stand by for one final attack. I will save you as much as possible, but I have to have the safety valve once in a while." And: "Thank the Lord I have got my money fixed for Monday. Had to do it on long distance phone, but I got it. Now you must arrange temporarily to hold that check for $30. It will probably be in to-morrow, whether it comes direct or from some other bank. Please arrange to *intercept* and hold it"

—and which letters mostly, if not all, were written with reference to checks drawn by Rogers on the First National Bank of Amsterdam, where he had no account. The court, in mentioning them, called attention to the contention of the government and to the explanation of Rogers, finally stating to the jury:

"Now, gentlemen, it is all for you to consider;" and, "Now, gentlemen, what is the significance of these letters?" and, "It is for you to say, gentlemen; that is the contention of the government, and take into consideration many of these phrases [in the letters] to which I have called your attention, and say what they mean."

As before stated, the jury was also told to consider the entire contents of the letters, and all the surrounding conditions and attendant circumstances, in determining their true meaning. The court expressed no opinion, unless it may be inferred it had an opinion that these letters, and particularly these expressions, indicated knowledge on the part of Rogers that the money he was obtaining on these checks drawn on the bank and directing the bank to pay them came from the bank, instead of the private funds of Brice, and were evidence ·on that subject proper for the consideration of the jury in determining when Rogers first knew the money was coming from the bank,·if he ever knew. Clearly the letters were competent and. pertinent evidence on that subject, and as clearly the court performed its duty in submitting them to the consideration of the jury and in' calling attention to the expressions relied on by the government, and in repeatedly submitting it to the jury to find and decide, in view ·of all· the evidence, what the letters and expressions meant, and what fact, if any, in connection with the other evidence, they established. The court did not indicate any opinion whether or not the evidence and letters together *established* such knowledge, but necessarily, by submitting them to the consideration of the jury and calling attention to the contention of the government, in substance said they had a tendency to establish such knowledge. Otherwise, it would have been the duty of the court to withdraw them from the consideration of the jury entirely. The probative weight and force of the letters was left to the jury, as well as the question whether they had any. The conduct of the trial on the part of the government was eminently fair, and the defendants as witnesses were given the widest latitude in explaining their intent and meaning, and in presenting every fact bearing on the questions at issue.

In a trial of this character, evidence competent against one or more of the defendants, and not against the other or others, was offered and admitted. The jury was cautioned, when it was received, that such evidence, admitted against one or two, must not be considered as against the ·others or the other, as the case may have been, and this was repeated in the charge. Jurors are presumed to observe and obey the instructions of the court.

[4] The defendant Murphy claims that his constitutional rights were invaded by questions calling on him to state whether or not before a prior grand jury (not the one which, found the indictment on which defendants were being tried) he gave certain testimony, and

whether or not he made a certain written statement at the request of the United States attorney (not before the grand jury), all pertinent to the charges contained in the indictment on which defendants were being tried.

The contention of the defendant Murphy is, and he so testified, that he was invited to the office of the United States attorney prior to the meeting of the grand jury referred to, and told that he would be used as the main witness on behalf of the United States, that there was nothing on the record against him, and that he was thus requested and encouraged and induced to make the written statement referred to, and as to which he was interrogated on this trial, and to go before the said grand jury (not the one which found the indictment on which he was being tried with Oppenheim and Rogers) and give the testimony to which his attention was called on this trial. He was not contradicted by the United States attorney in these regards, but when called before the grand jury referred to he in writing stated that he was giving his statement voluntarily, and in writing he expressly waived immunity before giving the testimony and after making the written statement which he gave to the United States attorney. On this trial he voluntarily gave evidence in behalf of himself and in behalf of his codefendants. He thus became subject to cross-examination. Statements or admissions made by him were proper subjects of inquiry, unless made under the inducement of fear or promises of favor, or were obtained by the government by misleading inducements. In 2 Chamberlayne on the Modern Law of Evidence, § 1479, pp. 1875, 1876, it is said:

"Confessions, it is said, must be voluntary. The reverse statements, that a confession which is involuntary will be rejected, and that a voluntary confession will be received in evidence, are equally familiar. * * * What is meant, apparently, is this: A confession, like any other statement offered as evidentiary, must, to be admissible, have been made because it was true. It is essential that the speaker should have known the truth of the matter covered by his declaration and honestly endeavored to state it. An incriminating statement made for some other reason than because it was true, in order to gain some advantage or avoid some injury, may not possess these elements of admissibility. Such a statement may therefore properly be *rejected*, often because irrelevant. The general ground for rejecting confessions is said to be that they are involuntary. The rule of procedure is firmly established that involuntary confessions will not be received in evidence. The confession made under a misleading inducement is therefore said to be involuntary."

In Wilson v. United States, 162 U. S. 613, 622, 623, 16 Sup. Ct. 895, 40 L. Ed. 1090, the court said, referring to confessions and admissions:

"In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort."

At page 622 (16 Sup. Ct. at page 899, 40 L. Ed. 1090), the court quoted with approval from Hopt v. Utah, 110 U. S. 574, 584, 4 Sup. Ct. 202, 28 L. Ed. 262, where it was said:

"But the presumption upon which weight is given to such evidence, namely, that one who is innocent will not imperil his safety or prejudice his interests by an untrue statement, ceases when the confession appears to have been made either in consequence of inducements of a temporal nature, held out by one in authority, touching the charge preferred, or because of a threat or

promise by or in the presence of such person, which, operating upon the fears or hopes of the accused, in reference to the charge, deprives him of that freedom of will or self-control essential to make his confession voluntary within the meaning of the law."

[5] But when it becomes a question of fact whether or not the confession or admission *was* voluntary the same is admissible in evidence, and the jury is to determine the fact and what credit they will give the statement made. Wilson v. United States, 162 U. S. 613, 624, 16 Sup. Ct. 895, 40 L. Ed. 1090; Commonwealth v. Preece, 140 Mass. 276, 5 N. E. 494; People v. Howes, 81 Mich. 396, 45 N. W. 961; Thomas v. State, 84 Ga. 613, 10 S. E. 1016; Hardy v. United States, 3 App. D. C. 35. In Wilson v. United States, supra, 162 U. S. at page 624, 16 Sup. Ct. at page 900, 40 L. Ed. 1090, the court held:

"When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant. Commonwealth v. Preece, 140 Mass. 276 [5 N. E. 494]; People v. Howes, 81 Mich. 396 [45 N. W. 961]; Thomas v. State, 84 Ga. 613 [10 S. E. 1016]; Hardy v. United States, 3 App. D. C. 35."

Murphy is a lawyer of many years' practice and had been a member of the Legislature of the state of New York. Clearly he was not ignorant of his right not to make a statement, or of his right not to give evidence before the grand jury. In no sense was he then being examined as a party accused. True, he implicated himself; but according to his written statement he went voluntarily before the grand jury, and when there he expressly waived immunity. The prior promise of the United States attorney, if it was a promise, to use Murphy as the principal witness for the government, accompanied by a statement there was nothing against him on the record, was not a promise not to prosecute him, and no such promise was made. In view of all the circumstances, it cannot be said as matter of law it was an inducement to make the statements or give the evidence, such as to make it improper to question him as to admissions then made when subsequently on trial on an indictment found subsequently by another grand jury at another term of court and when testifying as a witness on his own behalf and in behalf of the other defendants as to the same general subject-matter. These prior declarations and statements of Murphy were not offered or given in evidence against him as evidence in chief, but only by way of contradiction after he had voluntarily gone upon the stand and given evidence in his own behalf and that of his codefendants. On redirect Mr. Murphy was permitted to state all the facts relating to and all the circumstances under which he gave the testimony and made the written statement to which his attention had been called on cross-examination.

[6] When Murphy took the stand he waived his constitutional privilege of silence and made himself subject to the same rules of cross-examination as any other witness. Fitzpatrick v. United States, 178 U. S. 304, 315, 20 Sup. Ct. 944, 948 (44 L. Ed. 1078) where it is said:

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf, and makes his own statement, it is clear that the

prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts. The witness having sworn to an alibi, it was perfectly competent for the government to cross-examine him as to every fact which had a bearing upon his whereabouts upon the night of the murder, and as to what he did and the persons with whom he associated that night. Indeed, we know of no reason why an accused person, who takes the stand as a witness, should not be subject to cross-examination as other witnesses are."

This case is approved. Sawyer v. United States, 202 U. S. 150, 165, 26 Sup. Ct. 575, 50 L. Ed. 972, 6 Ann. Cas. 269.

Section 395 of the Code of Criminal Procedure of the state of New York provides as follows:

"A confession of a defendant, whether in the course of judicial proceedings or to a private person, can be given in evidence against him, unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney, that he shall not be prosecuted therefor, but is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed."

This rule established by the Code of Criminal Procedure in the state of New York is founded on the common-law rules, but is more definite and stringent. People v. Mondon, 103 N. Y. 211, 219, 8 N. E. 496, 57 Am. Rep. 709. This does not govern here, but it shows the tendency of modern legislation. Here Murphy voluntarily waived immunity, and proceeded to write his statement outside of court and the grand jury room, and to give his evidence before the grand jury. It seems to me clear that he waived his privilege, and that it was proper on this trial and on his cross-examination to inquire of him as to the statements then made after such waiver. Can it be that a person may waive immunity (conceding he has been previously told by the United States attorney that there is nothing against him on the record and that he will be used as the principal witness for the government against others), then give his testimony and make and deliver written statements to the United States attorney which implicate him, and then, when on trial on a subsequently found indictment against himself and others, give evidence in favor of himself and others covering the whole proposition involved in his former statements, and legally claim that his constitutional rights are invaded by asking him if he did not on such former occasion make specific statements at variance with his present testimony?

The witness Brice was in some respects corroborated by Murphy, by Rogers, and by Oppenheim. In other respects he was corroborated by other witnesses, and also by writings and by the letters referred to and letters written by Murphy. I find no substantial or prejudicial error. For a long time Oppenheim, Rogers, and Murphy occupied the same offices and were shown to have acted in concert and for their common benefit. On request they aided each other to obtain money from this bank through Brice.

The evidence was clearly sufficient to sustain the verdict of guilty on each of the counts submitted to the jury, and the motions as to

each defendant are denied. If, as intimated, a writ of error is desired, it will be granted as matter of right, and, if applied for and granted, the bail of Oppenheim, a citizen of France, is fixed at $15,000, and that of the others at $10,000 each.